140 Nev., Advance Opinion 62

## IN THE SUPREME COURT OF THE STATE OF NEVADA

| | |
|---|---|
| IN THE MATTER OF THE PARENTAL RIGHTS AS TO L.R.S., J.M.S., AND J.L.S., MINOR CHILDREN. | No. 86682 |

DARRELL RYAN S.,
Appellant,
vs.
MARIE S.,
Respondent.

**FILED**

SEP 19 2024

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY
CHIEF DEPUTY CLERK

Appeal from a district court order terminating parental rights. Eighth Judicial District Court, Family Division, Clark County; Paul M. Gaudet, Judge.

*Reversed and remanded.*

Keels Law Group, Inc., and Stephanie M. Keels, Las Vegas,
for Appellant.

Nevada Family Law Group, LLC, and Marilyn A. Caston, Henderson,
for Respondent.

BEFORE THE SUPREME COURT, HERNDON, LEE, and BELL, JJ.

## OPINION

By the Court, BELL, J.:

This case requires us to decide whether the considerations outlined in NRS 128.107 and NRS 128.109 apply where children are in the physical custody of a parent who is seeking termination of the other parent's

rights. Under NRS 128.107, courts must consider several enumerated factors in determining whether to terminate parental rights, including a parent's efforts to adjust their circumstances so that it is in the child's best interest to return home. NRS 128.109 creates a presumption that termination of parental rights is in the best interest of the child when the child has been placed outside the home. We hold that NRS 128.107 is limited to cases where children are not in the custody of either parent and that NRS 128.109 is limited to NRS Chapter 432B cases. As the district court applied these statutes to the instant case, a non-NRS Chapter 432B case where the children are in the custody of their mother, and also improperly applied factors in NRS 128.105 and 128.106, we reverse the district court's order terminating appellant's parental rights and remand for further proceedings consistent with this opinion.

## FACTS AND PROCEDURAL HISTORY

Appellant Ryan S. and respondent Marie S. married in 2011. Together, Ryan and Marie have three minor children: L.R.S. and twins J.M.S. and J.L.S. Divorce proceedings were instituted in 2019, and Ryan and Marie separated shortly thereafter. At the time, the children were approximately 3 years old and 2 months old, respectively.

Marie was awarded temporary primary physical and legal custody of the children, and Ryan was referred to psychologist Dr. Sunshine Collins for a full custodial evaluation to determine whether it was appropriate for him to be around the children for unsupervised visits. Initially, Ryan participated in supervised visits with the children at the Blue Butterfly House, a neutral third-party facility. According to Blue Butterfly House's summary reports, the visits generally went well. L.R.S. was happy to see Ryan, and the two would usually greet each other with a hug. Ryan would change the twins' diapers and interact with them when

Supreme Court
OF
Nevada

(O) 1947A

not playing with L.R.S. In violation of Blue Butterfly House's policies, however, Ryan occasionally play-fought too hard with L.R.S., took photos with his children, arrived early for visits, and was rude toward staff. As a result, Blue Butterfly House ended visits after about 6 weeks.

In early 2020, the district court found Ryan to be an unfit custodial parent, in part due to his self-diagnosed PTSD. The same day, the district court allowed Marie to temporarily relocate with the children to California. Ryan began weekly virtual visits with the children that were supervised by Marie's parents. After several months, Marie switched to a pay-to-use platform so that a neutral third party could supervise the visits. Because Ryan lacked the financial resources to use the platform,[1] he was unable to continue the virtual visits. In lieu of visits, Marie began sending Ryan weekly updates accompanied by photos. Ryan has not interacted with his children since June 2020.

Dr. Collins completed and submitted a 105-page report to the district court. As part of her report, Dr. Collins interviewed L.R.S. In his interview, L.R.S. stated that he enjoyed spending time with Ryan. Dr. Collins asked L.R.S. if Ryan had ever choked him as alleged by Marie. L.R.S. replied "No." Dr. Collins ultimately recommended that Marie be awarded sole legal and primary physical custody of the children and that Ryan participate in treatment or therapy one to two times per month with different providers to address his parental unfitness. Dr. Collins recommended that Ryan engage in reunification therapy with the children after he adequately addressed his mental health issues to the satisfaction of his providers. Dr. Collins further recommended that once reunification

---

[1]Ryan asserts that the cost to use this platform was $1 per minute.

therapy was complete, Ryan's visitation should gradually increase and culminate in unsupervised overnight visits with his children.

In March 2021, Ryan sent an email to Marie's counsel stating in part, "I want to see my children . . . I'm not a deadbeat father. I love my children and want to support them every bit as much as their mother does. I'm appealing to you in hopes that maybe you can talk some sense into [Marie]." This was preceded and followed by additional requests for visitation. In June 2021, Ryan sent four boxes of diapers and a box of wipes to Marie. In July 2021, Ryan sent Marie a check for $550 to help pay for part of a procedure on J.M.S.'s ears. Ryan also sent L.R.S. a custom pair of sneakers.[2]

Later that year, Ryan Christiansen, a licensed clinical social worker who had been treating Ryan since 2019, authored a letter stating that Ryan exhibited some of the criteria of PTSD but not enough to warrant a full diagnosis. Christiansen further stated that "Ryan has made consistent efforts to engage in therapy [and] practice[d] healthy coping skills." Christiansen recommended that Ryan have his visitation rights restored and that the court explore some form of custody.

Ryan was also evaluated by Dr. Eric Smith, a licensed clinical psychologist. In his report, Dr. Smith concluded that Ryan's mental illness and personality disorder test revealed that he was "within normal limits" and "there were no indications of significant psychopathology." Dr. Smith further determined that Ryan did not suffer from PTSD or personality disorder. Lastly, Dr. Smith recommended that Ryan should be reunited with his children. As part of his recommendation for reunification, Dr.

_____

[2]The record is unclear whether the sneakers were sent in September 2020 or 2021.

Smith referenced a report authored by Dr. Nancy Jenkins, a licensed clinical mental health counselor who had been treating Ryan since 2019. In her report, Dr. Jenkins opined that Ryan "is capable of caring and providing for his children."

In 2022, Christiansen authored a second letter detailing Ryan's treatment. Christiansen ultimately concluded that Ryan had done well in therapy and that Ryan should be "given immediate reunification with his children."

A default divorce decree was entered by the district court in March 2022. In the decree, drafted by Marie's counsel, the district court found that (1) Ryan was mentally unwell; (2) Ryan was not mentally, emotionally, or physically capable of caring for young children; and (3) Ryan had grabbed L.R.S. by the throat and had shaken J.M.S. as an infant so hard that she passed out and threw up. The latter finding was not supported by hospital or police records. The district court awarded Marie primary physical custody and sole legal custody of the children. The decree also outlined that, after Ryan complied with Dr. Collins' custody evaluation with respect to receiving treatment, "Ryan shall then engage in reunification therapy with the children." The decree further outlined that Ryan could request a modification of custody after the successful completion of Dr. Collins' recommendations. As part of the decree, the district court awarded Marie $10,581.36 in child support arrears, to be paid over 32 months.

Seven months later, Marie filed a petition to terminate Ryan's parental rights. At an evidentiary hearing on the petition, Ryan testified that he had purchased gifts for the children but did not send them because of financial constraints and because his then-attorney recommended that

he not send the gifts. Ryan further testified that when J.M.S. and J.R.S. were born, he provided them with a father's blessing at church. Ryan also explained that he had not paid child support to Marie because he did not have the funds to do so as it was difficult to secure a job due to a previous felony conviction.[3] Ryan asserted that he had secured employment as a truck driver in November 2022 but was laid off shortly before the hearing. Ryan further testified that he had learned parenting skills from Dr. Jenkins, specifically how to provide children structure and how to be more compassionate. When asked if he had ever moved the court for physical visitations, Ryan said he had not because he did not know how to do so.

Marie testified that the children were thriving and doing well in California. She testified that she and the children lived with her parents and that her parents had provided valuable support to the children. Marie also testified that after the weekly virtual visits that were supervised by her parents, L.R.S. would have nightmares the following nights. For this reason, Marie asserted, the virtual calls were terminated in favor of a pay-to-use platform.

One day later, the district court entered its findings of fact, conclusions of law, and judgment. The district court found that Ryan had not paid child support and that Ryan's assertion that he was unable "to pay child support [was] without merit, and disingenuous." The district court also found that the twins likely did not recall Ryan and that Ryan did not attempt to (1) request modification of custody through the court, (2) modify child support, or (3) notify the court of compliance with Dr. Collins' recommendations.

---

[3]Upon completion of probation, Ryan's felony was reduced to a misdemeanor.



Without independently analyzing each parental fault ground, the district court found that Ryan had abandoned and neglected his children and that his actions reached the "point of token efforts to support or communicate [with] the children." After considering the factors for termination outlined in NRS 128.107 and concluding that NRS 128.109's presumption that termination of parental rights was in the best interests of the children applied, the district court terminated Ryan's parental rights and ordered that the children's last names be changed. Ryan now appeals.

## DISCUSSION

The primary issues before us are (1) whether the district court erred when it applied NRS 128.107 and NRS 128.109, and (2) whether the district court erred when it terminated Ryan's parental rights. We address each in seriatim.

### Legal standard

"A party petitioning to terminate parental rights must establish by clear and convincing evidence that (1) termination is in the child's best interest, and (2) parental fault exists." *In re Parental Rts. as to A.J.G.*, 122 Nev. 1418, 1423, 148 P.3d 759, 762 (2006). "[T]erminating parental rights is an exercise of awesome power that is tantamount to imposition of a civil death penalty." *Id.* at 1423, 148 P.3d at 763 (internal quotation marks and footnote omitted). Therefore, this court "closely scrutinize[s] whether the district court properly preserved or terminated the parental rights at issue." *Id.* Conclusions of law, including the interpretation and construction of statutes, are reviewed de novo. *Dewey v. Redev. Agency of Reno*, 119 Nev. 87, 93-94, 64 P.3d 1070, 1075 (2003). The district court's factual findings are reviewed for substantial evidence. *In re Parental Rts. as to A.L.*, 130 Nev. 914, 918, 337 P.3d 758, 761 (2014). Substantial evidence is that which

"a reasonable person may accept as adequate to" support a conclusion. *Ellis v. Carucci*, 123 Nev. 145, 149, 161 P.3d 239, 242 (2007).

*NRS 128.107 and 128.109 are not applicable*

Before turning to the parental fault grounds found by the district court or the best interests of the children, we must first address the district court's application of NRS 128.107 and NRS 128.109.

While NRS 128.109 specifically applies to children in care of the state under NRS Chapter 432B, NRS 128.107 contemplates broader circumstances when children are not living with a parent, including relative placements and guardianships under NRS Chapter 159A. NRS 128.107 reads in pertinent part:

> *If a child is not in the physical custody of the parent or parents*, the court, in determining whether parental rights should be terminated, shall consider, without limitation:
>
> 1. The services provided or offered to the parent or parents to facilitate a *reunion* with the child.
>
> . . .
>
> 3. The effort the parent or parents have made to adjust their circumstances, conduct or conditions to make it in the child's best interest *to return the child to his or her home* after a reasonable length of time, including but not limited to:
>
> (a) The payment of a reasonable portion of substitute physical care and maintenance, if financially able;
>
> (b) The maintenance of regular visitation or other contact with the child which was designed and carried out in a plan to reunite the child with the parent or parents; and

SUPREME COURT
OF
NEVADA

(O) 1947A

(c) The maintenance of regular contact and
communication with the *custodian of the child.*

(Emphases added.) NRS 128.107 contemplates that its applicability is limited to circumstances in which a child is not in the custody of either parent. The statute specifically identifies cases where (1) a child is removed from his or her home, (2) a child is placed in the care of a custodian, and (3) a case plan is established to reunify the parent and child. These considerations make clear that NRS 128.107 cannot be applied where a child is in the physical care of a parent. A reading to the contrary would render part of the statute meaningless.[4] *See Leven v. Frey*, 123 Nev. 399, 405, 168 P.3d 712, 716 (2007) (explaining that statutory interpretation should not render parts of a statute meaningless). Accordingly, we conclude that the district court erred when it applied NRS 128.107 to the instant case.[5]

---

[4]We recognize the dicta contained in *Daly v. Daly*, 102 Nev. 66, 70, 715 P.2d 56, 58 (1986), *overruled on other grounds by In re Termination of Parental Rts. as to N.J.*, 116 Nev. 790, 800 n.4, 8 P.3d 126, 132 n.4 (2000), another case where termination of rights was sought by a custodial parent against the noncustodial parent. There, this court referenced NRS 128.107, but the reference was only to the proposition that a child of sufficient capacity should be heard as to their desires regarding a termination of rights. *Id.* *Daly* did not address the question we opine on today and is therefore distinguishable.

[5]Our dissenting colleague references this court's holding in *Drury v. Lang*, 105 Nev. 430, 431, 776 P.2d 843, 843 (1989), for the proposition that trial courts should consider NRS 128.107 in deciding termination cases involving a custodial and noncustodial parent. However, a reading of *Drury* does not support that proposition. *Drury* was an NRS 128.105 termination case, and this court only referenced NRS 128.107 when it quoted the language of NRS 128.105, which at that time contained references to NRS 128.106, 128.107, and 128.108. *Id.*

Turning to NRS 128.109, the statute establishes a presumption that termination of parental rights is in the best interest of the child when the child has resided outside the home for 14 of any 20 consecutive months. The statute also expressly limits its application to circumstances where a child has been removed from his or her home pursuant to NRS Chapter 432B:

> 1. If a child has been placed outside of his or her home *pursuant to chapter 432B of NRS*, the following provisions must be applied to determine the conduct of the parent:
>
> . . .
>
> 2. If a child has been placed outside of his or her home *pursuant to chapter 432B of NRS* and has resided outside of his or her home pursuant to that placement for 14 months of any 20 consecutive months, the best interests of the child must be presumed to be served by the termination of parental rights.

(Emphases added.) By its plain and unambiguous language, NRS 128.109 applies only when a child is placed outside his or her home pursuant to NRS Chapter 432B. *See Local Gov't Emp. Mgmt. Rels. Bd. v. Educ. Support Emps. Ass'n*, 134 Nev. 716, 718, 429 P.3d 658, 661 (2018) ("We give effect to a statute's or a regulation's plain, unambiguous language and only look beyond the plain language where there is ambiguity."). Accordingly, we conclude that the district court erred when it applied NRS 128.109 to the instant case.

*The district court's findings of parental fault are not supported by substantial evidence*

To terminate parental rights, the district court must find by clear and convincing evidence that at least one ground of parental fault exists. *See In re Parental Rts. as to A.J.G.*, 122 Nev. at 1423, 148 P.3d at

 

762. Here, the district court found three parental fault grounds: abandonment, neglect, and token efforts. While the district court's order did not separately analyze each ground, we address each ground independently. *See generally In re Parental Rts. as to D.R.H.*, 120 Nev. 422, 428-33, 92 P.3d 1230, 1234-37 (2004) (suggesting that separate analysis for each parental fault ground is preferred).

*Abandonment*

Ryan argues that he did not abandon his children as he made multiple requests for visitation. Marie argues that because Ryan has not seen his children since 2020 and because Ryan did not pay child support, the district court properly found that Ryan abandoned his children. Marie further argues that Ryan's failure to move the court to modify custody supports a finding of abandonment. We conclude that Ryan did not abandon his children.

Abandonment of a child occurs when a parent's actions demonstrate a "settled purpose . . . to forego all parental custody and relinquish all claims to the child." NRS 128.012(1). A presumption of abandonment arises when a parent "leave[s] the child in the care and custody of another without provision for the child's support and without communication for a period of 6 months." NRS 128.012(2). Though this presumption is not discretionary, it is rebuttable by a preponderance of the evidence. *In re Termination of Parental Rts. as to N.J.*, 116 Nev. 790, 802-04, 8 P.3d 126, 133-35 (2000); *see also In re Guardianship of N.M.*, 131 Nev. 751, 757, 358 P.3d 216, 220 (2015) ("Intent is the decisive factor in abandonment and may be shown by the facts and circumstances.").

In *In re D.D.*, we reviewed a district court finding that a mother had abandoned her three minor children after the children had been removed from her home by the department of social services for a period of

Supreme Court
OF
Nevada

(O) 1947A

nine months. No. 69068, 2016 WL 4082454, at *1 (Nev. July 28, 2016) (Order of Reversal and Remand). This court concluded that because the mother had repeatedly requested visitation and provided her children with gifts and letters, she had not demonstrated "a settled purpose 'to forego all parental custody and relinquish all claims to the children'" and did not abandon her children. *Id.* (quoting NRS 128.012). Accordingly, because the mother rebutted the presumption under NRS 128.012, we reversed. *Id.* at *2.

Here, although Ryan had not seen his children in six months, the presumption of abandonment does not apply, as the district court ordered the children to be placed in Marie's custody. Accordingly, the district court erred when it applied the presumption of abandonment. However, even if the presumption did apply, Ryan rebutted the presumption by a preponderance of the evidence by demonstrating that he did not have a settled purpose to forgo all parental custody and relinquish all claims to his children. Like the mother in *In re D.D.*, Ryan made several requests for visitation. He made consistent efforts to comply with the custody evaluation by meeting with multiple medical providers. And Ryan made efforts to support his children by sending diapers and wipes, money for J.M.S.'s ear procedure, and custom sneakers for L.R.S., despite Ryan's alleged financial challenges. Indeed, it appears that it may have been Ryan's financial challenges that largely prevented him from seeing his children, as Marie relocated the children out of state and required Ryan to use a pay-to-use platform to virtually visit the children. As we have recognized, a parent's inability to overcome financial barriers does not support a finding of abandonment. *See Matter of R.T.*, 133 Nev. 271, 274, 396 P.3d 802, 805 (2017) ("Under Nevada law, a district court may not find

SUPREME COURT
OF
NEVADA

(O) 1947A

parental fault if one's failure to care for his or her children is the result of a financial inability to do so.") (citing NRS 128.106(1)(e)).

We are also troubled by Marie's argument and the district court's finding that Ryan's parental rights should be terminated because Ryan did not move the court, as a pro se party, to modify custody. If we were to accept Marie's argument, unrepresented and/or indigent parents who struggle to understand the complexities of family court proceedings could be at risk of losing their parental rights. In our view, such a holding would be inequitable and contrary to the legislative intent to not punish parents based on financial deprivation. *See, e.g.*, NRS 128.106(1)(e). Given these observations, we are of the opinion that a pro se and indigent parent's inability to navigate the judicial system cannot be used as support for the finding of abandonment. Accordingly, we conclude that Ryan rebutted the presumption of abandonment and that substantial evidence does not support the finding that Ryan abandoned his children.

*Neglect*

Ryan argues that he did not neglect his children, as he made continual requests for visitation. Marie asserts that because Ryan has not shouldered the burden of financially or emotionally caring for the children, the district court properly found that Ryan neglected his children. We disagree.

Under NRS 128.106(1)(e), neglect occurs when a parent, although physically and financially able, repeatedly or continuously fails "to provide the child with adequate food, clothing, shelter, education or other care and control necessary for the child's physical, mental and emotional health and development[.]" As we have previously held, "a finding of neglect must be based upon the treatment of the child while the parent has custody: *neglect is not established when the child is left by the parent in an*



*environment where the child is known to be receiving proper care."* Chapman v. Chapman, 96 Nev. 290, 294, 607 P.2d 1141, 1144 (1980) (emphasis added).

Here, it cannot be said that Ryan's children were neglected or that Ryan's conduct was "sufficiently harmful" to the children to warrant termination of his parental rights. As Maria testified, the children were thriving and had all their needs met. Thus, even if Ryan were able to pay child support and elected not to do so, his failure to pay child support itself is not substantial evidence in support of a finding of neglect. *See Greeson v. Barnes*, 111 Nev. 1198, 1209, 900 P.2d 943, 950 (1995) (Springer, J., dissenting) ("Termination of parental rights is not designed as a way to punish parents who get behind in their child-support payments.").

*Token efforts*

Ryan argues that substantial evidence does not support the district court's finding of token efforts. Marie responds that Ryan made only token efforts to support and communicate with the children because Ryan has not interacted with his children in years and because Ryan failed to comply with Dr. Collins' recommendations. NRS 128.105(1)(b)(6) states that parental fault may be found if a court determines that a parent has made "Only token efforts . . . (I) [t]o support or communicate with the child; (II) [t]o prevent neglect of the child; (III) to avoid being an unfit parent; or (IV) [t]o eliminate the risk of serious physical, mental or emotional injury to the child."

The record shows that Ryan sought medical treatment to comply with the custody evaluation so that he could be reunited with his family. Ryan also made multiple requests for visitation. He sent diapers, wipes, and custom sneakers. Although Ryan purchased other gifts for his children, he did not send them due to financial constraints and on the advice

SUPREME COURT
OF
NEVADA

(O) 1947A

14

of counsel. These efforts, combined with Ryan's financial limitations, demonstrate that the district court's finding that Ryan made only token efforts is not supported by substantial evidence.[6] *Cf. In re N.J.*, 125 Nev. 835, 846, 221 P.3d 1255, 1263 (2009) (concluding that a parent's effort to support and communicate with her child were merely token efforts because the parent failed to adequately address her drug addiction and fell asleep during visits with her child).

As we conclude that clear and convincing evidence does not support the finding of parental fault, we reverse the district court's order terminating Ryan's parental rights. As the district court order also authorized the creation of amended birth certificates for the children, predicated on the termination of Ryan's parental rights, we remand this matter and further instruct the district court to order the destruction of any such amended birth certificates and restore the children's names to that which existed at the time immediately preceding the issuance of the amended birth certificates. *See Butler v. Eaton*, 141 U.S. 240, 244 (1891) (explaining that a reversed judgment is "without any validity, force, or effect, and ought never have existed," thereby placing parties in the same position they were in before the judgment was entered).

## CONCLUSION

Although courts may consider any number of facts in cases involving the termination of parental rights, neither NRS 128.107 nor NRS 128.109 apply under the circumstances presented here, where the children are in the custody of a parent. The district court impermissibly applied NRS

---

[6]Ryan argues that the district court violated his constitutional right to the care and custody of his children; however, as we conclude that the district court erred in terminating Ryan's parental rights, we need not address this issue.

128.107 and NRS 128.109. Furthermore, the district court's order terminating Ryan's parental rights is not supported by substantial evidence. We therefore reverse the district court's order terminating Ryan's parental rights and remand the case for further proceedings consistent with this opinion, instructing the district court to order the destruction of the children's amended birth certificates.

_____, J.
Bell

I concur:

_____, J.
Herndon

Supreme Court
OF
Nevada

(O) 1947A

LEE, J., concurring:

Although I agree with reversing the district court's ruling terminating Ryan's parental rights, I disagree with the majority's interpretation of NRS 128.107. For this reason, I am compelled to write separately.

The statute begins with "[i]f a child is not in the *physical custody of the parent or parents*, the court, in determining whether parental rights should be terminated, shall consider, without limitation," certain enumerated considerations. The court suggests that because certain subsections of the statute contemplate circumstances such as when a child is removed from his or her home, NRS 128.107(3), or when a child is placed in the care of a custodian, NRS 128.107(3)(c), the entire statute applies only when a child is not in the care of either parent. This interpretation, in my view, is not consistent with the plain language of the statute or with this court's precedent.

As this court has often said, when interpreting a statute, we look to the statute's plain language. *Arguello v. Sunset Station, Inc.*, 127 Nev. 365, 370, 252 P.3d 206, 209 (2011). This court likewise "consider[s] a statute's provisions as a whole so as to read them in a way that [will] not render words or phrases superfluous or make a provision nugatory." *Sunrise Hosp. & Med. Ctr., LLC v. Eighth Jud. Dist. Ct.*, 140 Nev., Adv. Op. 12, 544 P.3d 241, 247 (2024) (internal quotations omitted). Only when statutory language is ambiguous does this court consider legislative intent. *Chandra v. Schulte*, 135 Nev. 499, 501, 454 P.3d 740, 743 (2019). Here, the statutory language is clear. The statute is triggered when "a child is not in the physical custody of *the parent or parents.*" The words "parent or parents" encompass three different circumstances: (1) the child is in the

physical custody of one parent but not the other, (2) the child has only one legal parent and is not in their physical custody, or (3) the child is not in the physical custody of either parent.

As I read the statute, if a parent's parental rights are being considered for termination, and the child is not in the subject parent's physical custody, the statute applies. The syntax of the statute itself denotes whose physical custody status matters: that of *"the* parent or parents"* whose parental rights are being considered. To read this statute as only meaning the latter third circumstance of both parents (plural) would render the singular "parent" in the statute superfluous. *See id.* Even were the court to look to legislative intent, which it need not as the statute is unambiguous, the legislative intent does not support the interpretation that the statute is only applicable when a child is out of the physical custody of both parents. If the Legislature had intended the statute to apply only under this circumstance, it could have written the statute to say "[i]f a child is not in the physical custody of either parent." But we must assume that the Legislature, when it enacted the statute, purposely drafted the statute to read as it does. While some subsections, such as those referenced by the majority, may be limited to circumstances where a child is not in the physical custody of either parent, other subsections are not. For instance, NRS 128.107(2) permits a court to consider "[t]he physical, mental or emotional condition and needs of the child and the child's desires regarding the termination, if the court determines the child is of sufficient capacity to express his or her desires." As nothing in this subsection suggests that it is limited to circumstances where a child is not in the custody of either parent, a court may consider it when determining whether to terminate the parental rights of a noncustodial parent.

Our caselaw further suggests that NRS 128.107 applies to circumstances when a child is in the physical custody of one parent but not the other. In *Drury v. Lang*, a father was awarded custody of his children. 105 Nev. 430, 431, 776 P.2d 843, 843 (1989). After the children's mother failed to communicate with them for six months, the district court terminated her parental rights. *Id.* at 432, 776 P.2d at 844. Although this court reversed the termination of parental rights, it clarified that when faced with similar cases, namely cases where a child is in the physical custody of one parent but not the other, district courts should consider the best interests of the child as outlined in NRS 128.107 and other statutes when deciding whether to terminate the parental rights of the noncustodial parent. *Id.*

In the instant case, I would hold that the district court did not err when it applied NRS 128.107. Rather, I would hold that the considerations outlined in NRS 128.107 do not support the termination of Ryan's parental rights. As the court ultimately reaches this conclusion, I join the majority in the result only.



_____ , J.
Lee